UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| INTERNAL MEDICINE NEPHROLOGY, INCORPORATED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:18-cv-00506-JRS-DLP |
| BIO-MEDICAL APPLICATIONS OF INDIANA, INC., et al., | ) ) ) ) | |
| Defendants. | ) | |

**Entry Granting Defendants' Motion to Dismiss**

Plaintiff Internal Medicine Nephrology, Inc. alleges that Defendant Fresenius Medical Care Holdings Inc. and various related entities (collectively, "Fresenius") attempted to monopolize and monopolized the dialysis services market in the Terre Haute area in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff also alleges various related state-law antitrust, tort, contract, and quasi-contract claims.[1]

Defendants move to dismiss Plaintiff's Sherman Act claim for lack of antitrust injury and lack of antitrust standing. For the reasons below, Defendants' motion to dismiss (ECF No. 44) is **granted**, and Plaintiff's Sherman Act claim is **dismissed** without prejudice to amending its complaint. Because courts should generally relinquish supplemental jurisdiction over pendant state-law claims when all federal claims are dismissed, *see Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d

---

[1] Some of the state-law claims are also alleged against Defendant Michael Graves, an employee of one or more of the Fresenius entities.

1

716, 727 (7th Cir. 1998), Plaintiff's state-law claims are also dismissed without prejudice.

**Background**[2]

Plaintiff is a nephrology practice group based in Terre Haute, Indiana. "When a nephrologist's patient requires dialysis services, the nephrologist refers the patient to a dialysis provider." (Compl. ¶ 14.) Medicare requires that every dialysis facility have a medical director—"one or more nephrologists who oversee the delivery and quality of care provided at the dialysis facility." (Compl. ¶ 15.) Due to the time-consuming and repetitive nature of dialysis, patients typically will not drive more than 30 to 45 minutes for dialysis services. (Compl. ¶ 23.) Plaintiff identifies the relevant market as "dialysis services within a 30–45 minute travel distance of Terre Haute." (Compl. ¶ 34.)

Fresenius provides dialysis services at its dialysis clinics in Terre Haute and the surrounding area. "Fresenius has had significant market power in the provision of kidney dialysis services in that it could control prices by controlling supply, and/or excluding competition with the effect of not keeping historical costs in check which negatively impact reimbursement rates paid by payors, including Medicare." (Compl. ¶ 32.) From 2006 until 2017, Fresenius was the only dialysis service provider in the relevant market, and Plaintiff served as medical director at all six facilities—four outpatient and two inpatient. Plaintiff was also involved in Fresenius's efforts to open a facility in Paris, Illinois, and Defendants promised that Plaintiff would serve

---

[2] Consistent with the Rule 12(b)(6) standard, Plaintiff's allegations are taken as true and all reasonable inferences are drawn in Plaintiff's favor.

2

as medical director of that facility. (Compl. ¶¶ 45–53.) Plaintiff alleges that under federal law and regulations relating to Medicare reimbursements, "neither a dialysis provider nor a nephrologist can dictate which dialysis facility a patient must use[,] and a dialysis provider cannot financially reward a patient or a physician for a specific referral." (Compl. ¶ 17.)

In October 2017, DaVita entered the relevant market, opening three dialysis facilities in the Terre Haute area. The only other nephrology practice group in Terre Haute served as medical director of the DaVita facilities. (Compl. ¶ 58.) After DaVita's entry, Fresenius (1) insisted that Plaintiff interfere with patient choice by barring its employee-physicians' nephrology patients from transferring to DaVita facilities; (2) threatened Plaintiff and its employee-physicians that "IMN needs Fresenius more than Fresenius needs IMN"; (3) ordered Fresenius employees to tell patients that Plaintiff's physicians were "liars"; and (4) "[c]oerced Fresenius employees and staff to engage in consistent and targeted acts intended to coerce patients" to remain at Fresenius facilities or transfer back to Fresenius facilities. (Compl. ¶ 56.)

Plaintiff and its employee-physicians refused to comply with Fresenius's demands, so Fresenius terminated its medical director agreements with Plaintiff for four facilities and selected a different medical director for the Paris facility, replacing Plaintiff with an Indianapolis-based medical director that acquiesced in Fresenius's demands. (Compl. ¶¶ 61, 63.) After replacing Plaintiff as medical director, Fresenius began to solicit Plaintiff's nephrology patients to leave Plaintiff for Fresenius's new

medical director. (Compl. ¶ 61.) Fresenius falsely told others that Plaintiff was replaced as medical director due to concerns about quality. (Compl. ¶¶ 73, 76.)

Plaintiff's medical director agreements with Fresenius for each facility included noncompete provisions prohibiting Plaintiff from serving as medical director for a competing dialysis facility within 25 miles of the respective Fresenius facility. (Compl. ¶ 43.)

**Legal Standard**

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion to dismiss, the court takes the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). The court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "[I]f a plaintiff pleads facts that show its suit [is] barred . . . , it may plead itself out of court under a Rule 12(b)(6) analysis." *Orgone Capital*, 912 F.3d at 1044 (quoting *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (on a motion to dismiss "district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim'") (quoting *Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir. 1992)).

## Discussion

Defendants argue that Plaintiff has not suffered "antitrust injury" and that Plaintiff lacks "antitrust standing." Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a private right of action for violation of the antitrust laws: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . , and shall recover threefold damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Despite the Clayton Act's apparent breadth, the Supreme Court—drawing on congressional intent and common-law principles—has developed two related doctrines that limit the scope of the private right of action: antitrust injury and antitrust standing. Neither antitrust injury nor antitrust standing implicates the limits of the "judicial Power" under Article III. *See U.S. Gypsum Co. v. Ind. Gas Co.,* 350 F.3d 623, 627 (7th Cir. 2003) (noting the "potential for confusion with Article III standing").

Antitrust *injury* limits private antitrust actions to those alleging "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust *standing*, on the other hand, limits private antitrust actions to those plaintiffs positioned to enforce the antitrust laws most efficiently. *See Serfecz v. Jewel Food Stores, Inc.*, 67 F.3d 591, 598 (7th Cir. 1995) ("From the class of injured persons suffering an 'antitrust injury' only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing

to maintain a private action under § 4.") (quoting *In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 516 (7th Cir. 1982)). Antitrust injury is a necessary, but not necessarily sufficient, condition for antitrust standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons.").

To determine whether a putative antitrust plaintiff's claim falls within the scope of the antitrust laws, courts undertake a case-specific inquiry guided by six factors set forth by the Supreme Court:

(1) The causal connection between the violation and the harm;

(2) Improper motive;

(3) Whether the injury was of a type that Congress sought to redress with the antitrust laws;

(4) The directness between the injury and the market restraint;

(5) The speculative nature of the damages; and

(6) The risk of duplicate recoveries or complex damages apportionment.

*Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 927 (7th Cir. 1995) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 544–45 (1983)). "Together, the first three factors relate to what courts commonly refer to as 'antitrust injury.' The remaining factors address whether the plaintiff is among those who can most efficiently vindicate the purposes of the antitrust laws." *McGarry & McGarry, LLC v. Bankr. Mgmt. Sol., Inc.*, --- F.3d ----, No. 18-2619, 2019 WL 4197546,

at *4–5 (7th Cir. Sept. 5, 2019). "The factors are neither strict requirements nor exclusive analytical tools. They simply illustrate the areas of inquiry that may be relevant to a case-specific evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Id.* (quotation marks and citation omitted).

The Seventh Circuit "usually presume[s] that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws."[3] *Id.* at *5 (citing *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016)). Plaintiff is neither competitor nor consumer in the relevant market: it does not purchase or sell dialysis services. Evaluation of Plaintiff's harm, Fresenius's alleged wrongdoing, and the relationship between them confirms that the usual presumption applies; Plaintiff—neither competitor nor consumer—has not adequately alleged antitrust injury or established that it can efficiently vindicate the purposes of the antitrust laws.

The alleged antitrust violations here are monopolization and attempted monopolization. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992); *see also Blue Cross & Blue*

---

[3] Plaintiff appears to argue that the relevant question is not whether Plaintiff has suffered antitrust injury but whether *anyone* has. *See* Pl.'s Resp. 13–14. Plaintiff cites no authority for this assertion.

7

*Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) ("[I]f the practice of medicine in some sparsely populated county of north central Wisconsin is a natural monopoly, consumers will not be helped by our forcing the handful of physicians there to affiliate with multiple HMOs."). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The elements are conjunctive; a single firm's conduct does not violate the Sherman Act in the absence of monopoly power or danger of monopoly power. *Id.* at 455 ("Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. . . . Thus, the conduct of a single firm, governed by § 2, is unlawful only when it threatens actual monopolization.") (quotation marks and citation omitted).

"To establish an antitrust injury, a plaintiff must show . . . that the violation was 'the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred.'" *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (quoting *Greater Rockford Energy & Tech. v. Shell Oil*, 998 F.2d 391, 394–96 (7th Cir. 1993)). Neither Plaintiff's loss of revenue from termination of the medical director agreements, nor its contractual exclusion from serving as a medical director within 25 miles of a terminated facility, flows from that which makes monopolization unlawful: market power.[4] *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,

---

[4] Plaintiff does not allege that the noncompetition provisions of its medical director agreements constitute unreasonable restraints of trade in violation of section 1 of the Sherman Act.

711 F.3d 68, 77 (2d Cir. 2013) ("Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful."). Plaintiff has not been forced to pay supracompetitive, monopoly prices for dialysis services. Nor has Plaintiff endured losses inflicted by predatory pricing. *See id.* ("Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might."). Unlike such paradigmatic monopolist conduct (supracompetitive pricing and predatory pricing), Fresenius's alleged acts would be both economically possible and economically rational without market power.[5] *See In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 519 (7th Cir. 1982) ("Bichan has sustained no 'antitrust injury' because, while he may have suffered some injury-in-fact[,] he was not the target of the alleged anticompetitive practices and his injury, therefore, did not result from the defendants' acquisition or exploitation of market power."). Indeed, the harm to Plaintiff bears no relationship to Fresenius's power in the relevant market, as Plaintiff would have suffered the same loss whether Fresenius acted to increase its market share from one percent to two percent or from 99 percent to 100 percent. *See Brunswick*, 429 U.S. at 488 ("[R]espondents' injury

---

[5] Perhaps Fresenius's demands were especially coercive because Fresenius had monopsony power in the medical director market, but the complaint contains no allegations about that market. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir. 1988) ("The relevant product here is pathologists, not pathology services, and the corresponding relevant market is the market in which pathologists compete for jobs, not the market in which hospitals compete in offering pathology services to patients."); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) ("While the precise dimensions [of the anesthesiologist market] are not clearly defined, the market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts . . . and may be statewide or merely local.") (quotation marks and citations omitted). Plaintiff's allegation that it was replaced by an Indianapolis-based medical director tends to undermine any inference that the dialysis services market and the medical director services market are geographically coextensive.

9

. . . bears no relationship to the size of either the acquiring company or its competitors. Respondents would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents."); *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 96 (3d Cir. 1986) ("Similarly, the reduced profit on commissions, although it resulted from the [unlawful agreement], was not caused by the anticompetitive nature of that agreement. If Red Cheek had reduced its prices for all buyers, for example, Gregory would still have lost commissions, but there would have been no antitrust violation. Conversely, if Red Cheek had provided Wakefern with special discounts, but simply absorbed the loss itself . . . the agreement would be equally anticompetitive, but Gregory would have suffered no injury."). Had Plaintiff acquiesced in Fresenius's demands, "there would have been no injury, yet the anticompetitive nature of [Fresenius's] policy would not have been affected one iota. So it is not an 'antitrust injury.'" *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1169 (7th Cir. 1978).

Moreover, Plaintiff does not adequately allege that its loss of market share in the nephrology market to its Indianapolis-based replacement is injury "of a type Congress sought to address with the antitrust laws." As with the medical director services market, the complaint contains few allegations about the nephrology market. What little is alleged does not support an inference of antitrust injury. On Plaintiff's own allegations, before 2018, there were just two nephrology practice groups in Terre Haute. (Compl. ¶ 58.) The introduction of another competitor into that market, and Plaintiff's concomitant loss of market share to that competitor, is not antitrust injury.

10

"As in *Brunswick,* the plaintiff's complaint is too much competition (injuring producers) rather than too little (injuring consumers). Entertaining claims of excessive competition would undermine the functions of the antitrust laws[.]" *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

Courts do, on occasion, find antitrust injury and antitrust standing where the plaintiff is neither competitor nor consumer in the relevant market. For instance, Plaintiff relies on the Seventh Circuit's statement in *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002), that "different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus that differently situated plaintiffs might be able to raise claims." In *Loeb*, the plaintiffs alleged that the defendants conspired to fix copper prices by hoarding physical copper and manipulating the copper futures market. *Id.* at 474. The plaintiffs in *Loeb* were participants in the physical copper market and not the copper futures market, yet the Seventh Circuit held that those plaintiffs had antitrust standing. But *Loeb* is the exception that proves the rule: the Seventh Circuit had previously held that the "futures market and the cash market [for a commodity] are . . . 'so closely related' that *the distinction between them is of no consequence to antitrust standing.*" *Sanner*, 62 F.3d at 929 (emphasis added). There are no allegations here to suggest that the medical director services market and the dialysis services market are as closely related as the cash and futures markets for a single commodity.

Plaintiff also relies on the Supreme Court's statement in *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948), that the Sherman Act "does not

11

confine its protection to consumers, or to purchasers, or to competitors, or to sellers." (Pl.'s Resp. 15.) To the extent Plaintiff cites *Mandeville Island Farms* for the proposition that there is no *per se* rule excluding a class of market participants from the antitrust laws' scope, the point is well-taken: antitrust standing is a case-specific inquiry. *See Associated Gen. Contractors*, 459 U.S. at 536 ("[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the judgment in deciding whether the law affords a remedy in specific circumstances."). But *Mandeville Island Farms* does not support finding antitrust standing in this case. There, the plaintiffs—sugar beet farmers—alleged that the defendants, sugar refiners, conspired to fix the prices at which they purchased sugar beets. The plaintiffs were thus sellers in the relevant market, so the holding does not support antitrust standing here.

To the contrary, the caselaw weighs heavily against finding that Plaintiff adequately alleges antitrust injury and standing. In *Sw. Suburban Bd. of Realtors, Inc., v. Beverly Area Planning Assoc.*, 830 F.2d 1374, 1379 (7th Cir. 1987), the plaintiff alleged a scheme to monopolize the real estate brokerage services market in two neighborhoods. *Id.* But the plaintiff did not provide brokerage services or purchase brokerage services in those markets; it provided listing services to brokerage service providers. *Id.* Thus, the Seventh Circuit held that "any injury which [the plaintiff] sustained by virtue of the defendants' alleged boycott . . . was only indirectly related

12

and incidental to the anticompetitive scheme, the intent and effect of which was allegedly to gain control of the real estate brokerage services market[.]" *Id.* So, too, here: Plaintiff is not a market participant but merely provides a service to market participants. Plaintiff's claimed injury "was only indirectly related and incidental to the [alleged] anticompetitive scheme, the intent and effect of which was allegedly to gain control of" the dialysis services market in the Terre Haute area and thereby exclude DaVita. *Id.*

Plaintiff contends that its claimed injuries are "inextricably intertwined" with the alleged antitrust violation; that Plaintiff's injuries in the medical director market (termination of the agreements and replacement with a co-conspirator) and in the nephrology market (steering its patients to that co-conspirator) are direct consequences of Fresenius's scheme to exclude DaVita from the relevant market. (*See* Pl.'s Resp. 17.) In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982), the Court held that the plaintiff had alleged antitrust injury because her injury was "inextricably intertwined with the injury the conspirators sought to inflict" on the market. "As the Court later described its holding, what mattered was that the plaintiff was a participant in the market targeted by the alleged conspiracy and was 'directly harmed by the [insurer's] unlawful conduct.'" *McGarry*, 2019 WL 4197546, at *6 (quoting *Associated Gen. Contractors*, 459 U.S. at 529 n.19).

Here, by contrast, Plaintiff is not a participant in the target market, dialysis services, so *McCready* is inapposite. *See McGarry*, 2019 WL 4197546 at *6 (distinguishing *McCready* because "McGarry, however, is not a participant in the market for

13

bankruptcy software services."); *Norris v. Hearst Trust*, 500 F.3d 454, 467 (5th Cir. 2007) (distinguishing *McCready* where the plaintiffs were "neither consumers nor competitors in the market attempted to be restrained" and collecting cases). Moreover, the purported link between Plaintiff's claimed injuries and Fresenius's alleged scheme is Plaintiff's refusal to cooperate in that scheme, but the Seventh Circuit has twice held that such retaliatory termination does not constitute antitrust injury or confer antitrust standing. In *Industrial Gas*, the plaintiff alleged that the defendant terminated his employment because he refused to participate in a price-fixing conspiracy. 681 F.2d at 515. The Seventh Circuit held that the plaintiff, as neither a consumer nor a competitor in the relevant market, did not suffer antitrust injury and did not have antitrust standing. *Id.* at 519 ("Bichan has sustained no 'antitrust injury' because, while he may have suffered some injury-in-fact[,] he was not the target of the alleged anticompetitive practices and his injury, therefore, did not result from the defendants' acquisition or exploitation of market power."); *id.* at 520 ("Since Bichan is neither a consumer nor a competitor of Chemetron, his injury was indirectly caused by defendants' alleged price-fixing conspiracy and he does not have antitrust standing to maintain this suit."). In *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1062–63 (7th Cir. 1997), the plaintiff alleged that the defendant terminated her employment because she refused to sign a noncompetition agreement that she deemed unlawful. Citing *Industrial Gas*, the Seventh Circuit held that "an employee discharged for refusing to participate in an alleged antitrust violation has no standing to sue on the basis of that violation." *Id.* at 1065.

Plaintiff attempts to distinguish *Industrial Gas* and *O'Regan*, arguing that their holdings "merely foreclose antitrust standing for plaintiffs claiming labor injuries, when the plaintiff's labor injury was not derived from reduced competition in the labor market[.]" (Pl.'s Resp. 14.) Nothing in *Industrial Gas* or *O'Regan* indicates their holdings rely on unique features of the labor market that would preclude analogy to the termination of medical director agreements in this case. As in *Industrial Gas* and *O'Regan*, here Plaintiff claims injury inflicted for opposing a scheme to control a market other than a market in which Plaintiff was a participant. It follows that Plaintiff has not alleged antitrust injury or antitrust standing.

Beyond the attenuated relationship between Plaintiff's claimed injury and the alleged antitrust violation, Plaintiff lacks antitrust standing because patients and payors (insurers) in the relevant market are "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," undermining any "justification for allowing a more remote party . . . to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542. Plaintiff contends that individual patients "lack the time, resources, and potentially the general ability" to sue to protect their interests and that "there is nothing to indicate if the harm to one or more individuals would satisfy the requirements of Rule 23[.]" (Pl.'s Resp. 16.) Even assuming these contentions are correct, Plaintiff's argument wholly fails to address payors, who would bear the brunt of any monopoly prices and "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Id.*

Accordingly, Plaintiff does not adequately allege antitrust injury or antitrust standing, and its Sherman Act claim is therefore **dismissed** without prejudice to filing an amended complaint. The Court's jurisdiction in this case arises from Plaintiff's federal-law, antitrust claim, with supplemental jurisdiction over the state-law claims authorized by 28 U.S.C. § 1367. Plaintiff's sole federal-law claim is dismissed by this order, and "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— . . . the district court has dismissed all claims over which it has original jurisdiction"). The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, and those claims are **dismissed** without prejudice.

## Conclusion

For the reasons above, Defendants' Motion to Dismiss is **granted** and Plaintiff's claims are **dismissed** without prejudice to filing an amended complaint. Plaintiff may file an amended complaint on or before October 28, 2019; if no amended complaint is filed within the allotted time, judgment will issue dismissing Plaintiff's federal-law claim with prejudice and Plaintiff's state-law claims without prejudice for lack of jurisdiction.

**SO ORDERED.**

Date: 9/26/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Steven E. Bizar
DECHERT LLP
steven.bizar@dechert.com

Jessica L. Busch
DICKINSON WRIGHT PLLC
jbusch@dickinsonwright.com

Julia Chapman
DECHERT LLP
julia.chapman@dechert.com

Samuel B. Gardner
ICE MILLER LLP (Indianapolis)
samuel.gardner@icemiller.com

George A. Gasper
ICE MILLER LLP (Indianapolis)
george.gasper@icemiller.com

Kelleene Ann Holden
DRESSMAN BENZINGER LAVELLE PSC
kschoening@dbllaw.com

Craig Morris McKee
WILKINSON, GOELLER, MODESITT, WILKINSON & DRUMMY
cmmckee@wilkinsonlaw.com

Andrew D. Pellino
DRESSMAN BENZINGER LAVELLE PSC
apellino@dbllaw.com

Jillian M. Taylor
DECHERT LLP
jillian.taylor@dechert.com

L. Pahl Zinn
DICKINSON WRIGHT PLLC
pzinn@dickinson-wright.com